IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD HATCH,                                        CIVIL DIVISION

           Plaintiff,                                  Case No.   2:21-CV-409

      v.

LEAFGUARD HOLDINGS, INC.,

    Defendant.

## COMPLAINT AND JURY DEMAND

A.   ***Preliminary Statement***

1.     The plaintiff Richard Hatch brings this action under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.,* to redress violations of his right to be free from employment discrimination and retaliation based upon his disability.  Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*  A jury trial is demanded.

B.   ***Jurisdiction***

2.     The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 12117(a), 28 U.S.C. § 1331 and under the doctrine of pendant jurisdiction.

3.     On or about August 13, 2020, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 553-2020-02062.  This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4.     The EEOC issued a Notice of Right to Sue dated February 9, 2021.

5.      The plaintiff filed this complaint within 90 days of receipt of the Notice of Right to Sue.

C.      ***The parties***

6.      The plaintiff Richard Hatch is an adult individual who resides at 669 Gambel Road, Oakdale, PA 15071 (Allegheny County).

7.      The defendant LeafGuard Holdings, Inc. ("LeafGuard" or "the company") is an entity doing business in the Commonwealth of Pennsylvania, and, specifically, in this district. The defendant has a place of business located at 3253 Old Frankstown Road, Suite C, Pittsburgh, PA 15239 (Allegheny County).

8.      At all times material, the defendant employed more than fifteen employees.

9.      The defendant was the plaintiff's employer and is an employer within the meaning of the ADA, 42 U.S.C. § 12111(5).

D.      ***Factual Background***

10.     The plaintiff worked for LeafGuard as a salesman from July 2, 2016 until July 31, 2020, at which time his employment was terminated.

11.     LeafGuard manufactures and sells a patented gutter system for residential homes.

12.     The plaintiff's duties included: traveling to prospective customer's homes, making presentations regarding the LeafGuard gutter system, answering customer questions, taking measurements and preparing quotes and executing contracts.

13.     During his employment, LeafGuard's management considered the plaintiff to be an excellent and productive employee who consistently met or exceeded expectations.  He had consistently high sales, averaging over $1,000,000 in sales each year and he was awarded

2

"Salesman of the Month" seven times and "Salesman of the Year" in 2017, very impressive accolades.

14.     The plaintiff has a disability as defined by the Americans with Disabilities Act ("ADA") and/or was perceived by the employer as having a disability.  Specifically, he has heart disease, a physical and/or mental impairment that substantially limits one or more of the major life activities of the plaintiff.  In approximately 1990, when the plaintiff was 38 years old, he suffered a massive heart attack.  After the heart attack, his ejection fraction was measured at between 30% and 25% (a normal reading is between 65% and 70%).

15.     In May 2018, the plaintiff had a stroke that resulted in a one-week hospitalization. He returned to work with a full schedule and had to do rehabilitation therapy in the mornings before heading out to his first appointment for the day because he could not get time off of work to schedule it during the day.

16.     In August 2019, the plaintiff had a heart episode that resulted in a one-week hospitalization.  His ejection fraction dropped from 25% to 15%.  His condition was so serious that the plaintiff was referred to the Heart Failure Clinic at Allegheny Hospital in preparation for a heart transplant if required.

17.     The plaintiff was off of work for a total of two weeks before he was able to return. He attempted to work a full schedule, but was experiencing difficulties breathing.  Mark Walsh, General Manager, and the plaintiff's direct supervisor reduced the plaintiff's schedule to one appointment a day in a relatively local area for a period of time until the plaintiff was able to recover.

18.     In May 2020, the weather began to get warm as late-Spring transitioned into Summer.  The plaintiff was able to work despite the heat.  On May 15, 2020, for example, the

temperature reached 81 degrees and the plaintiff sent a group text to Walsh, Adam Dowler, Regional Manager, and some of his family members that he felt fine.

19.     The Covid-19 pandemic forced a change in how the plaintiff performed his job. Before the pandemic, the time the plaintiff was required to work outside during appointments was limited and most of the sales presentation was done in the potential customer's homes. When the pandemic hit, the plaintiff had to do the entire sales call outside; due to social distancing requirements, it was not advisable to be in the customer's homes in close quarters. The plaintiff found that as long as the temperature stayed below 88 degrees, he was able to manage without too many heart-related problems.  However, when the temperature went above 88 degrees, the plaintiff's ability to function in the heat was compromised significantly.

20.     On July 2, 202, the temperature reached 91 degrees while the plaintiff was training a new salesman.  Training involved the plaintiff going on appointments with the new hire and doing the presentations.  That day, they had two appointments, which had to be done outside in the sun (each appointment typically lasts four hours).  The plaintiff felt awful, totally drained of energy and could barely make it home at the end of the day.

21.     On July 3, the plaintiff was not able to go to work because he was so dehydrated and exhausted from the prior day.  Not including the stroke and heart incidents detailed above, this was the first time in four years that the plaintiff decided to take a day off of work. Significantly, the plaintiff did not request any additional time off of work and felt that he would be fine and able to work after the Fourth of July holiday.  After being notified by the plaintiff about his decision to take a day off, Walsh notified the plaintiff's wife that the plaintiff would have to secure a doctor's note permitting him to return to work.  Since it was a holiday weekend, the plaintiff's doctor's office was closed.

4

22.     The plaintiff communicated with Walsh about the situation on July 4.   The plaintiff reminded Walsh that his current doctor's slip covered this situation; namely, his physician had provided a note that the plaintiff was permitted to work "as tolerated" in the event of extremely hot days.   Specifically, the plaintiff sent Walsh the following text message:

> Ok, we better get things going.  Time is wasting.  My last return to work from the doctor stated, "work as tolerated" because we knew there was a problem working in the heat.   When temperatures began rising I told you that I was testing my ability to work in the heat and texted the results [referring to the message that the plaintiff sent on May 15, 2020 and detailed above]. Unfortunately, because of COVID 19, all of our appointments are being held outside in the heat which has now reached the 90's.  I can not physically handle two long appointments, outside, in the heat.  If I have to have a doctors slip every time the temperatures rise above 90, and my health is at risk, we have a problem. Thought we had discussed this ad-nauseum but evidently not.   The doctors offices are close for the 4th.  My doctors will return on the 6th.  I have a $17k sale waiting for me on Monday.  What do you have to have to solve this problem because the reps [sic] are going to be mid 90s this week.

23.     Walsh responded that he was waiting to hear back from Human Resources ("HR") for a decision.  On July 5, 2020, Walsh sent the plaintiff a text message that he had received an email from HR that the plaintiff was permitted to return to work on July 6.

24.     On July 6, 2020, the plaintiff attended a sales meeting, led by Walsh.  He did not feel well and the plaintiff texted Walsh a message advising him of this (the plaintiff sent a text so as to not interrupt the meeting).  Since the appointment he was supposed to go to following the meeting cancelled, he decided to go home.  He sent a text message to Walsh that afternoon and reported that he felt better: "I'm better.  Think I am dehydrated.  Really bad.  Heart seems ok. Just thought I'd tell you."  The plaintiff also suggested that Walsh schedule his appointments at 10:00 a.m. and/or 7:00 p.m. to avoid the hottest part of the day (sales appointments were typically scheduled for 10:00 a.m., 1:00 p.m., 4:00 p.m. and 7:00 p.m.).

25.     The plaintiff received a call from HR indicating that the plaintiff's doctor had to fill out a certification regarding the plaintiff's health issues and sent over the paperwork for the doctor to complete.  The plaintiff made an appointment with his doctor for the next day, July 7.

26.     The plaintiff went to his appointment and had the doctor fill out the forms.  The plaintiff faxed the forms to HR the next day, July 8.

27.     The doctor's certification confirmed what the plaintiff had been telling the company's management all along, namely, that the plaintiff was permitted to work in the heat as tolerated and that he may need to take a couple hours off of work – on an intermittent basis – on extremely hot days.  The doctor noted that the plaintiff might experience "episodes of shortness of breath, fatigue, weakness, [and] lightheadedness.  There's not [sic] time frame for these symptoms to occur."

28.     The plaintiff was not permitted to return to work after July 7, despite the fact that the certification was provided to the company on July 8.  The plaintiff texted Walsh during the ensuing week and was told that HR had yet to approve his return to work.

29.     After not hearing anything from HR, the plaintiff sent an email to Adriana Oviedo, Senior HR Generalist, on July 15:  "I have now lost thousands of dollars in income. Shall I look for another job or have you come to a conclusion?"

30.     On Friday, July 17, 2020, the plaintiff (along with his wife) had a telephone call with Oviedo and Shannon Cox, Director of HR, and Walsh.  They told the plaintiff that they could not grant his request regarding working in the heat as "tolerated" and, instead that he would have to take unpaid FMLA leave for twelve weeks until October.  They also told him that they could not accommodate his request for a "part-time schedule", which was odd because the plaintiff had never asked to work part-time.

6

31.     After that call and later in the day, Oviedo followed up with an email to the plaintiff "recapping" their conversation.   Oviedo, however, continued to mischaracterize the details and recommendations of the plaintiff's doctor's certification and reiterated that the only "accommodation" that the company would provide was having the plaintiff take 12 weeks of unpaid FMLA time through October.  In pertinent part, Oviedo stated as follows:

> [Y]our medical paperwork states that an accommodation of a part-time or reduced work schedule from March through October is needed on a yearly basis in order to perform your job duties.  Because your role is a full-time, field position, and based on business needs an equitable workforce, we cannot accommodate this part-time schedule.   Also, because we are currently in the March-October timeframe, we have an obligation to ensure your health and medical well-being is taken seriously, and therefore cannot schedule you for work at this time.

The plaintiff's options, per Olviedo, were to (1) take unpaid FMLA time until October; (2) "choose to mutually separate with the company and apply for unemployment"; or (3) get a new certification from the plaintiff's doctor permitting him to return to work with no restrictions.

32.     In subsequent conversations with Walsh, management and HR, the plaintiff repeatedly stated that: (1) he was not seeking a part-time position; (2) that his doctor's certification and the plaintiff's own requests were for an accommodation to work in the heat as tolerated and that he might need to take a couple hours off during hot days on an intermittent basis (as is permitted under the FMLA); and (3) his doctor would not release him to return to work with "no restrictions" but the restrictions listed did not impact his ability to do all the essential functions of his job.

33.     The company rejected the plaintiff's request for intermittent leave, telling the plaintiff that he could not take FMLA leave intermittently and that he had to take the leave all at once, for the full 12 weeks.

34.     The plaintiff returned all the company property that he had in his possession on July 20 because he was not permitted to return to work.

35.     On July 23, the plaintiff had a telephone conference with Walsh, Cox and Oviedo. During the conversation, all three insisted that the plaintiff had not been terminated, but that he could not return to work without another certification from his doctor releasing him with no restrictions.   The plaintiff responded that, "I am fired if I can't go back to work" and their response was that the company "just can't accommodate a reduced work schedule."   The plaintiff told them that he wasn't asking for a "reduced work schedule", just an accommodation that would allow him to take a couple of hours off during days when it is too hot to work outside.

36.     On July 23, 2020, the plaintiff sent an email to Walsh in yet another attempt to explain his request for an accommodation:

> As we have discussed repeatedly, Covid 19 has changed how I must perform my job.  Now, I must spend the entire appointment outside to do the presentation.  You know that was not true before.  We spent perhaps an hour outside and then did the presentation in the cool of the house.  That has now changed.  There are some days where the heat is too much and I have found that I cannot be outside for an extended period of time – especially when the temperature is in the upper 80s or above.

> We talked a lot about my current work situation and the FMLA paperwork/request for accommodation.  The doctor's certification is quite clear and unambiguous regarding my restrictions and I don't see a need to go back to him for further "clarification".  Simply put, I may need to take two or three hours off one or two days in any given week depending on the temperature during the day between March and October.  In other words, if it gets too hot, I may need to take some time off.   I think that this is a reasonable request for an accommodation, but Adriana and Shannon do not seem to agree.

> In any event, I do not expect that I will need more than 12 weeks off in any given year.

> Adriana and Shannon are suggesting that I get my doctor to amend his original written document that I may come back "without restrictions."   He cannot provide such a certification.  I do have restrictions, as stated in his paperwork and as summarized above.

8

Adriana and Shannon repeatedly said that I am not terminated but that they cannot accommodate my need to avoid heat as prescribed by my cardiologist.  We are at an impasse.  So I would like you to clear this up for me.

37.    The plaintiff received a call from Walsh and Dina Hernandez, Vice President, on July 24, 2020.  They repeated the same options:  12 weeks off with FMLA followed with a recertification from his doctor releasing him to work with no restrictions.  The plaintiff again asked about intermittent leave – taking a couple of hours off of work on hot days as needed. Walsh and Hernandez told him that he could not take FMLA incrementally and that the company does not have part-time employees.

38.    On July 29, 2020, Cox sent the plaintiff a letter:

Given what we perceive as a lack of clarity from you, the Company's position is that you have made a request for a reasonable accommodation under the Americans with Disabilities Act of 1990, but that action is only the first step in an informal, interactive process between you and the Company.  To date, the Company believes that you have failed and/or refused to engage in that interactive process and complete the necessary paperwork to allow the Company to advance this matter.  Contrary to your prior statements, the company has not terminated your employment.  If you are interested in pursuing a potential reasonable accommodation, we encourage you to immediately actact Adriana Oviedo at (732) 934-9578.

39.    The plaintiff was perplexed by this communication.   He had made repeated requests for an accommodation starting in early July:  he suggested the he be scheduled for morning and early evening appointments during extremely hot days; he asked to take intermittent leave – a couple of hours in the afternoons if the temperature was too high to be tolerated; he assured the company that he did not need to take 12 weeks of FMLA all at once; and he explained that the doctor's certification did not suggest a "work restriction" that would necessitate a part-time position.  In short, the plaintiff did everything that he could possibly do, several times, to assure the company that he could perform all of the essential functions of his

job with his requested accommodation.  Further, the requested accommodation was reasonable and would not have placed any undue hardship on the company.

40.     On July 31, 2020, the plaintiff sent the following email to Cox in response:

Thanks for your letter dated July 29, 2020.  I disagree that I have shown a "lack of clarity" regarding my request for an accommodation.  To the contrary, I have been very clear and consistent regarding this matter.  My request for an accommodation was that I be permitted to take intermittent leave pursuant to the FMLA on days during which it is too hot for me to work outside safely.  My physician provided you a certification that this time off will, in all probability, be limited to a couple of hours every couple of weeks, depending on the temperature. Obviously, during more temperate weather/heat conditions, no accommodation will be necessary.  With this accommodation, I would have been able to perform all of the essential functions of my job.

I also disagree that I have "failed and/or refused to engage" in an interactive process with the company to discuss my need for an accommodation.  Again, to the contrary, I have repeatedly requested this accommodation only to be told that I have to get a certification to return to work "with no restrictions" or to take my FMLA leave all at once during the summer months.  Further, I have been told repeatedly that I am not permitted to take intermittent FMLA – which, to my understanding, is contrary to the law, and that the company cannot accommodate a part-time schedule.  I didn't need or ask to work part-time.  Taking a couple of hours off of work during extremely hot days was not a request to work part-time.

The company has told me that I have not been terminated; however, I have not been permitted to return to work, despite the fact that I have provided all of the documentation needed from my physician.  Given the length of time that has passed with no resolution of my employment status, I cannot help but conclude that I have been, in fact, terminated from employment or, at the very least, constructively discharged from my job.  As a result, I consider myself no longer employed by the company and I do not agree with any other characterization that you may place on my employment status.

Thank you for your consideration.

41.     The plaintiff received a return email from Cox indicating that she would be out of the office until August 3.  The plaintiff never received any further communication from Cox or anyone else in HR or management regarding his employment.

10

42.     Although the company refused to admit that it had terminated the plaintiff's employment, that is, in fact, what it did.

43.     The real reason that he was terminated was because of his disability. Further, the company refused to provide the plaintiff's requested reasonable accommodation that would have enabled him to continue to perform all of the essential functions of his job.

## FIRST CAUSE OF ACTION

44.     The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

45.     The plaintiff has a disability and thus is protected against discrimination under the ADA.

46.     The plaintiff was qualified for his position.

47.     At all times relevant, the defendant knew of the plaintiff's disability and/or regarded the plaintiff to be a disabled individual.

48.     The plaintiff was able to perform his position with or without a reasonable accommodation.

49.     Despite his qualifications, the plaintiff was terminated.  The reasons given for his discharge were a pretext.

50.     The defendant's discharge of the plaintiff was because of his disability, in violation of the ADA.

51.     Further, the company refused to provide the plaintiff's requested reasonable accommodation that would have enabled him to continue to perform all of the essential functions of his job.

52.    The defendant's violation of the ADA was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of discrimination.

## SECOND CAUSE OF ACTION

53.    The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

54.    As a direct and proximate cause of its actions, detailed above, the defendant has violated the plaintiff's right to be free from discrimination under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 *et seq.*

WHEREFORE, the plaintiff respectfully requests judgment be entered in his favor and against the defendant and that the defendant be required to provide all appropriate remedies under the ADA and the PHRA, including attorney's fees and costs.

Respectfully submitted,


*/s/ Michael J. Bruzzese*
Michael J. Bruzzese
Pa. I.D. No. 63306

2315 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219

(412) 281-8676

Counsel for the plaintiff

Dated:  March 30, 2021